IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

CASE NO.: 1:16-cv-1266 TWP-DKL

"JOHN DOE", an individual,

     Plaintiff,

vs.

BUTLER UNIVERSITY, an Indiana non-profit corporation,
JAMES M. DANKO, an individual,
LEVESTER JOHNSON, an individual,
STACIE COLSON PATTERSON, an individual,
ANNE FLAHERTY, an individual,
SALLY CLICK, an individual,
ERIN McCLUNEY, an individual,
ROBERT PADGETT, an individual,
MARTHA DWIZLIK, an individual, and
"JANE SMITH ", an individual,

     Defendants.

_____ /

## AMENDED COMPLAINT (REDACTED)

The Plaintiff, "JOHN DOE",[1] an individual ("Plaintiff"), by and through his undersigned

counsel, files this Complaint seeking both compensatory damages (in excess of $75,000.00) from,

and injunctive relief against, BUTLER UNIVERSITY, an Indiana non-profit corporation

---

[1]    Plaintiff's motion for leave to proceed under a pseudonym, "JOHN DOE", has now been granted (DE-7), [DE-8], resulting in the filing of a redacted complaint (and amended redacted complaint).  A subsequent order also required him to refer to a Butler student named as a defendant in the Complaint by a pseudonym as well, "JANE SMITH." [DE-10].

1

("BUTLER"), JAMES M. DANKO, an individual ("DANKO"), LEVESTER JOHNSON, an individual ("JOHNSON'), STACIE COLSON PATTERSON, an individual ("PATTERSON"), ANNE FLAHERTY, an individual ("FLAHERTY"), SALLY CLICK, an individual ("CLICK"), ERIN McCLUNEY, an individual ("McCLUNEY"), ROBERT PADGETT, an individual ("PADGETT"), MARTHA DWIZLIK, an individual ("DWIZLIK"), and "JANE SMITH", an individual ("JANE SMITH"), and states:

## SUMMARY OF THE COMPLAINT

Plaintiff, a resident of Florida, was enrolled as a full-time undergraduate student at Butler University, located in Indianapolis, Indiana. During his freshman year, his academic performance was excellent, as he achieved a "B+" grade point average. However, in the spring of 2015, he was falsely accused by a fellow student, "JANE SMITH", of non-consensual sexual activity. Her allegations led to a formal grievance being filed by BUTLER against Plaintiff, which gave him certain very limited rights to due process, namely: the right to an administrative hearing, the right to call witnesses in his behalf, the right to submit questions to be asked of witnesses called by BUTLER, and the right to be represented by an individual of his choosing (attorney or a student adviser). No grievance proceedings were instituted against "JANE SMITH".

At that hearing, the critical issue to be decided by an Equity Grievance Panel ("Panel"), comprised of faculty members from BUTLER, was whether the sexual activity between Plaintiff and "JANE SMITH" – which was not denied by either of them – was consensual. The preponderance of the evidence not only weighed in favor of Plaintiff, the evidence was **overwhelmingly** in his favor, as "JANE SMITH" herself testified that **she never said or did anything to indicate to Plaintiff, either before or during their physical contact, that she was not consenting to same**.

2

To the contrary, her actions over a period of several hours on the night in question, as witnessed by persons called as witnesses by **both** sides, demonstrated overt behavior by her which was totally consistent with the encounter between Plaintiff and "JANE SMITH" being completely consensual.

For example, Plaintiff and "JANE SMITH" danced intimately with each other at a fraternity party for several hours, and in the presence of approximately 100 witnesses, were "making out" during that entire time; the couple made several attempts to leave the party together, only to be restrained by "JANE SMITH'S" girlfriends, who did not want her to leave the party with Plaintiff – not because of any improper behavior by Plaintiff, but rather due to their own concerns about "JANE SMITH"; and finally, when confronted by one of those girlfriends, as Plaintiff and "JANE SMITH" were about to enter his dormitory, she ("JANE SMITH") indicated that **she wanted to go with Plaintiff to his room**.  In short, the evidence showed completely consensual behavior by both Plaintiff and "JANE SMITH" – before and during the sexual activity which occurred that night in Plaintiff's dormitory room, said activity ending when "JANE SMITH" indicated that it "hurt", and Plaintiff properly considering that language as an indication that she was withdrawing consent.

Notwithstanding the above, unrebutted testimony, at least one member of the Panel, CLICK, improperly put the burden of proof **on Plaintiff** to prove that he had obtained actual **verbal** consent before the sexual activity commenced, which is inconsistent with BUTLER'S Civil Rights Equity Grievance Policy (hereinafter, "Policy").[2]  That policy addresses, *inter alia*, sexual contact between the university's students, and although it requires that a **formal** consent be obtained by a student prior to any sexual contact with another student, that consent can be obtained through "word **or**

---

[2]

A copy of the Policy is attached hereto as Exhibit "A".

3

action" (*emphasis added*); otherwise, the contact is deemed to be non-consensual and a violation of the Policy, thereby subjecting an offending student to sanctions – up to and including expulsion.

Ultimately, the Panel, comprised of CLICK, PADGETT, and McCLUNEY, found that Plaintiff had engaged in non-consensual sexual activity with "JANE SMITH", despite the overwhelming evidence to the contrary. The Panel recommended that he be immediately and permanently expelled from BUTLER, with his permanent student record marked to indicate the expulsion.[3]

These severe sanctions were approved by FLAHERTY, the non-voting chairperson of the Equity Grievance Panel, and PATTERSON, BUTLER'S Title IX Coordinator. An administrative appeal, allowed in writing only, was timely submitted to PATTERSON, who upheld the Panel's decision, notwithstanding numerous procedural and substantive errors committed during the grievance process. Exhaustive efforts were made by Plaintiff, through undersigned counsel, to convince BUTLER to allow him to voluntarily withdraw from the school, and to have his permanent record corrected accordingly. BUTLER and its personnel with the authority to accept such a compromise – including PATTERSON, DANKO, as President of BUTLER, and JOHNSON, as Vice-President for Student Affairs – refused to either reverse the decision of the Panel, or to allow Plaintiff to voluntarily withdraw from the school.

But these acts were not the only denial of due process that Plaintiff suffered at the hands of

---

[3]

The actual language placed on his permanent record is as follows:

"May 18, 2015 – Dismissed permanently from the University."

BUTLER and the above-named individual defendants.  Plaintiff is Hispanic, while none of the named defendants are (upon information and belief, one is African-American, and the rest are white and non-Hispanic), and Plaintiff believes that the decision to institute grievance proceedings against him in the first place were racially motivated.  Plaintiff also believes that improper pressure was brought to bear by both the complaining student, "JANE SMITH", and her father, for BUTLER to expel him, even before the school's investigation had begun and well before the grievance proceedings commenced.  BUTLER "fast-tracked" the proceedings against Plaintiff: the alleged non-consensual sexual activity occurred on April 19, 2015; the Panel convened a one-day hearing on May 14, 2015; and Plaintiff was served with the Final Determination letter on May 18, 2015, which informed him of the Panel's decision and the sanction imposed by the school.  Other than being allowed to finish his final examinations, Plaintiff was ordered off campus immediately upon the service of that letter (in fact, he had to ask for permission to come back on campus to retrieve his personal belongings, and was only allowed to do so with a BUTLER police officer present).

An independent criminal investigation was conducted by the Prosecutor's Office for Marion County, and **<u>no criminal charges were filed against Plaintiff</u>**.  Nevertheless, the actions of BUTLER and the other named defendants have resulted in actual and substantial injury to Plaintiff, namely, that his academic record bears the stigma of permanent expulsion – and when asked in applications to other colleges to explain the reasons for the expulsion, Plaintiff has been truthful and forced to acknowledge that he was accused of and found guilty (albeit improperly) of sexual misconduct.  Thus he has effectively been labeled as a sex offender at the age of 19 just as if he had been found guilty of a criminal act and his name placed on a state sex offender registry.

The false allegations against Plaintiff, the lack of due process afforded him by BUTLER and

the other Defendants, and the evidence of racial animus against him, have already had far-reaching consequences: he applied to seven (7) colleges, and was rejected by all seven – and in each and every case, the reason he was not accepted was the expulsion from BUTLER, and the circumstances leading up to that expulsion.  The psychological toll on Plaintiff is severe, as for more than six months after his expulsion, Plaintiff had to live with the very real possibility that he would be totally unable to obtain admission to another college. Plaintiff had been defamed, and his ability to succeed academically at any college or university, much less one of his choosing, was seriously placed in jeopardy – which, in turn, will affect his ability to earn a living throughout his adult life.[4]

For all of the reasons stated above, Plaintiff has filed this action, seeking compensatory damages in excess of $75,000.00 and injunctive relief.

## THE PARTIES

1.      Plaintiff is an individual who resides in Miami, Florida and is otherwise *sui juris*.

2.      BUTLER UNIVERSITY is a non-profit corporation organized and operated under the laws of the State of Florida.

3.      JAMES M. DANKO is an individual who, upon information and belief, resides in the State of Indiana and is otherwise *sui juris*.  He is the President of BUTLER.

4.      LEVESTER JOHNSON is an individual who, upon information and belief, resides

---

[4]

Shortly before the date of filing of this Complaint, Plaintiff was accepted by St. Louis University in St. Louis, Missouri, after receiving rejections from seven (7) other colleges.  However, there is a significant difference in the academic quality of the schools (*i.e.*, Butler v. St. Louis): according to the 2015 U.S. News and World Report's rankings of America's best colleges, Butler ranked #2 among "Midwest Universities", whereas St. Louis University was tied for #199 among "National Universities".

in the State of Indiana and is otherwise *sui juris*.  He is the Vice-President for Student Affairs at BUTLER.

5.      STACIE COLSON PATTERSON is an individual who, upon information and belief, resides in the State of Indiana and is otherwise *sui juris*.  She is the Title IX Coordinator for BUTLER.

6.      ANNE FLAHERTY is an individual who, upon information and belief, resides in the State of Indiana and is otherwise *sui juris*.  She was the non-voting chairperson of the Equity Grievance Panel which found Plaintiff in violation of school policy as set forth in greater detail below.

7.      SALLY CLICK  is an individual who, upon information and belief, resides in the State of Indiana and is otherwise *sui juris*.  She was one of the three (3) voting members of the Equity Grievance Panel which found Plaintiff in violation of school policy as set forth in greater detail below.

8.      ERIN McCLUNEY is an individual who, upon information and belief, resides in the State of Indiana and is otherwise *sui juris*.  She was one of the three (3) voting members of the Equity Grievance Panel which found Plaintiff in violation of school policy as set forth in greater detail below.

9.      ROBERT PADGETT is an individual who, upon information and belief, resides in the State of Indiana and is otherwise *sui juris*.  He was one of the three (3) voting members of the Equity Grievance Panel which found Plaintiff in violation of school policy as set forth in greater detail below.

10.      MARTHA DWIZLIK is an individual who, upon information and belief, resides in

the State of Indiana and is otherwise *sui juris*.  She was the investigator for the Equity Grievance Panel which found Plaintiff in violation of school policy as set forth in greater detail below.

11.     "JANE SMITH" is an individual who, upon information and belief, resides in the State of Indiana and is otherwise *sui juris*. At all times relevant hereto, she was and is a student at BUTLER who made the allegations in issue against Plaintiff.

## JURISDICTIONAL ALLEGATIONS

12.     This Court has subject matter jurisdiction in this case on several grounds.

13.     First, there are counts based on violations of federal statutes, specifically, 20 U.S.C. §1681 (also known as "Title IX") (discrimination based on sex) and 42 U.S.C. §1981 (discrimination based on race), giving the Court jurisdiction under 28 U.S.C. §1331 (jurisdiction arising under federal question).

14.     Alternatively, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 (diversity jurisdiction) as there is complete diversity between the Plaintiff – a citizen of Florida – and the Defendants, who are all citizens of Indiana.

15.     In addition to the federal claims brought in this action, Plaintiff has alleged several causes of action under Indiana law.  This Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. §1367 as these claims are so related to the federal claims "that they form part of the same case or controversy under Article III of the United States Constitution."

16.     This Court also has personal jurisdiction over all Defendants in that they reside and/or conduct business on a regular and ongoing basis in the State of Indiana and in the Southern District of Indiana.

17.     Venue is proper in the Southern District of Indiana pursuant to 28 U.S.C. §1391(b)(1)

8

because Defendants are subject to personal jurisdiction in this district and therefore "reside" in this district, as that term is defined in 28 U.S.C. §1391(c)(3).

18.     Venue is also proper in this district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events that give rise to the claims asserted herein occurred in this district.

19.     Finally, all conditions precedent to the filing and prosecution of this action have either been satisfied or waived.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Events Leading to BUTLER'S Investigation

20.     Virtually all of the events upon which Plaintiff's Complaint is based occurred in the evening hours of April 18, 2015 and the early morning hours of April 19, 2015.

21.     In the fall of 2014, Plaintiff enrolled as a freshman undergraduate at BUTLER.

22.     During his first semester, he had an intimate (sexual) relationship with another BUTLER student, ANNALISE LARSON ("LARSON").[5]

23.     Testimony was introduced at the grievance hearing that, during their relationship, all sexual activity between Plaintiff and LARSON was consensual, which supported Plaintiff's testimony that he was well-aware of BUTLER'S policy about sexual contact between students, and in particular, the requirement that such activity be consensual.

24.     At approximately midnight on Saturday night, April 18, 2015, Plaintiff decided to attend a party at Delta Tau Delta Fraternity.  He went to the party with his roommate, MATTHEW GOFF ("GOFF"), and GOFF'S girlfriend, ALLIE RAMSEYER ("RAMSEYER").

---

[5]

LARSON was a character witness for Plaintiff at the grievance hearing.

9

25.     Plaintiff, along with GOFF and RAMSEYER, were among the first students to arrive at the party.

26.     Plaintiff consumed alcohol prior to going to the party, and also consumed alcohol at the party.  However, this consumption occurred over a period of many hours, and at no time on the night and morning in question was he intoxicated, either while attending the party or after he left the party with "JANE SMITH".

27.     Shortly after arriving at the party, Plaintiff saw "JANE SMITH", who was with one of her friends, Riley Higgins.  He approached her and began talking with "JANE SMITH". Eventually, he asked her to dance, and they began dancing.

28.     According to numerous witnesses who eventually testified at the grievance hearing, both for and against Plaintiff, he and "JANE SMITH" began to dance more intimately, and eventually started "making out" on the dance floor, in full view of all the other students attending the party.[6]

29.     There was an obvious attraction between Plaintiff and "JANE SMITH", and they decided to leave the party to go to his dormitory room.

30.     However, unbeknownst to Plaintiff, "JANE SMITH" had recently broken up with her boyfriend, and her girlfriends had decided amongst themselves that they would "watch out" for "JANE SMITH" during the party, to make sure she (1) did not drink to excess and/or (2) get involved with anyone she might meet at the party.

---

[6]
The intimate nature of the dancing included extreme physical contact which was described by several eyewitnesses as "grinding."

10

31.    These friends of "JANE SMITH", all of whom are women, acknowledge that they are a very tight-knit group of students; they even have a name for their clique, "The Shakin' Hams", and several of them testified in the grievance hearing that several of them knew each other (through other family members) even before attending BUTLER.

32.    In other words, "JANE SMITH'S" friends were (according to them) trying to protect a friend from "making a mistake" while she was "vulnerable".

33.    Of course, what these "friends" failed or refused to recognize was that "JANE SMITH" was a free actor, an adult over the age of consent, who had the absolute right to make her own decisions that evening, including whether or not she wanted to be with Plaintiff, and to what extent she wished to become intimate with him.

34.    On at least two (2) occasions during the subject party, Plaintiff and "JANE SMITH" attempted to leave the party, but were confronted and prevented from leaving by one or more of "JANE SMITH'S" friends.

35.    Eventually, "JANE SMITH", without any assistance or inducement from Plaintiff, concocted a plan by which the two of them could be alone.  The plan consisted of the following: "JANE SMITH" would indicate to her friends that she was tired and wanted to go back to her room at  her dormitory, Schwitzer Hall; Plaintiff would agree to walk her back to her room to make sure she got there safely; once at Schwitzer Hall, "JANE SMITH" would take a photograph of herself in her room and send it to her friends to assure them that she had gotten home safely, when in fact they ("JANE SMITH" and Plaintiff) would be together at Plaintiff's room in another dormitory, Ross Hall.

36.    This plan, revealed by "JANE SMITH" to Plaintiff, reasonably led Plaintiff to believe

11

that "JANE SMITH" wanted to be alone with him (other behavior by "JANE SMITH" which occurred later, to be described below, would reasonably indicate to Plaintiff that not only did "JANE SMITH" want to be alone with him but that she was and did in fact consent to sexual activity with him).

37.     At approximately 2:00 A.M. on Sunday, April 19, 2015, "JANE SMITH" and Plaintiff left the party, and proceeded to Schwitzer Hall, "JANE SMITH'S" dormitory.

38.     Once there, Plaintiff waited outside her room; "JANE SMITH" came out of her room within a few moments, and the couple proceeded to walk over to Plaintiff's dormitory, Ross Hall.

39.     While en route to their destination, "JANE SMITH" and Plaintiff were approached by one of "JANE SMITH'S" friends, (Mary) Kate Richards, who wanted to know why they were going to Plaintiff's dormitory.  During this conversation, "JANE SMITH" acknowledged that she was going to his (Plaintiff's) room consensually, and at no time did "JANE SMITH" indicate to her friend, either by word or action, that she did not wish to go with Plaintiff.

40.     At that point, "JANE SMITH'S" friend left, and "JANE SMITH" and Plaintiff continued on to Plaintiff's room.

41.     Once inside the room, "JANE SMITH" and Plaintiff began taking off each other's clothing, and then engaged in sexual contact – oral contact at first, then intercourse.

42.     Throughout this period, "JANE SMITH" was indicating to Plaintiff by her actions that  she was consenting to the sexual activity.

43.     Shortly after intercourse began, "JANE SMITH" stated that "it hurt", and requested that Plaintiff stop, which he did, **immediately**.

44.     There was no further sexual contact between them, and shortly thereafter, one  of

12

"JANE SMITH'S" friends, Ms. Loughman, knocked on the room door.

45.     Plaintiff opened the door, whereupon the friend (Loughman) saw "JANE SMITH" unclothed, and demanded to know why she ("JANE SMITH" ) had lied to her about going back to the dormitory.

46.     "JANE SMITH", obviously humiliated and embarrassed, then told her friend that she has been sexually assaulted by Plaintiff.

**BUTLER'S Investigation Begins**

47.     BUTLER'S investigation began on or about April 20, 2015, approximately one to one and one-half days after the incident occurred.

48.     Upon information and belief, before the investigation began, "JANE SMITH'S" father, "BILL SMITH", met with either the President of BUTLER (DANKO) or a Vice-President, and demanded that Plaintiff be dismissed from BUTLER, notwithstanding the fact that he (Plaintiff) had certain due process rights and that the university had not even determined if, in fact, any violation of school policy had occurred.

49.     This intense pressure from "JANE SMITH'S" father colored BUTLER'S entire investigation, including but not limited to BUTLER'S chief investigator, DWIZLIK, and Detective Diane Sweeney of the BUTLER Police Department, who assisted DWIZLIK with the investigation, being predisposed to believe that Plaintiff had, in fact, sexually assaulted "JANE SMITH".

50.     Upon information and belief, at the same time that BUTLER was conducting its investigation, Marion County prosecutors began an independent investigation into whether a criminal sexual assault had occurred – yet at no time does it appear that the two (2) investigations coordinated with each other, except for a single conference between Detective Sweeney and Kimberly Rasheed,

an assistant district attorney with the Marion County Prosecutor's Office, after which it was determined that **no criminal charges would be filed against Plaintiff**.[7]

51.     Although Plaintiff did not have access to DWIZLIK'S investigative report,[8] both he and "JANE SMITH" were interviewed by her, and DWIZLIK acknowledged being told by "JANE SMITH" that she ("JANE SMITH") allowed Plaintiff to undress her while they were in his dormitory room without any objection, an action clearly indicating consent.

52.     DWIZLIK completed her report and submitted it to PATTERSON.  That report, dated May 8, 2015, was heavily redacted and was not turned over to Plaintiff or his counsel until after the grievance hearing took place 6 days later.

53.     Plaintiff, to his credit, fully cooperated with both BUTLER'S investigation and Marion County's investigation.  He gave a voluntary statement to Detective Sweeney in which he freely and fully acknowledged that he had engaged in consensual sexual activity with "JANE SMITH", despite her later comments to the contrary.  There were no questions posed by Detective Sweeney that Plaintiff refused to answer, and at no time did he invoke his constitutional rights against self-incrimination, either during that interview or during the grievance hearing.

54.     On April 30, 2015, Plaintiff was notified by email (from PATTERSON) that the information provided to her by DWIZLIK was "sufficient to support a possible policy violation."

---

[7]

Plaintiff was not advised until after the Panel conducted his grievance hearing that the Marion County prosecutors were not going to prosecute him, yet BUTLER refused to consider this newly-discovered evidence as support for Plaintiff'S appeal.  *See* this Complaint, *infra* at ¶¶70-72.

[8]

DWIZLIK read a summary of that report at the Panel's hearing.

55.     Plaintiff was then notified that the grievance hearing would be conducted on May 14,

2015.  Although he was advised of his right to provide the Panel with the names of witnesses that

he wished to call on his behalf, he was not provided with a copy of the investigator's (DWIZLIK'S)

investigative report (as noted above) prior to the hearing,[9] nor did he know the names and identities

of witnesses being called by "JANE SMITH" – or by BUTLER on her behalf – until after the

Grievance Hearing had begun.

**The Grievance Hearing**

56.     During the grievance hearing, an opaque wood panel, approximately eight feet in

height, was placed between the table at which Plaintiff sat (with his counsel and student advisor) and

the table at which "JANE SMITH" sat (with her advisor, her father).  At no time during the hearing

was "JANE SMITH" visible to either Plaintiff or his counsel.

57.     At no time during the hearing was Plaintiff or his attorney allowed to directly

question any witness; he was only allowed to submit potential questions to the Panel Chair

(FLAHERTY), who decided which questions would be read to the witnesses (she herself read

questions which she had approved).  Not all of the questions submitted by Plaintiff's counsel were

approved by FLAHERTY, and thus counsel's ability to question witnesses was further limited.

58.     Throughout the hearing, and in particular during Panel member CLICK'S direct

questioning of Plaintiff,[10] it was obvious that Plaintiff was being forced by the Panel to demonstrate

---

[9]

And when he was provided with a copy of that report, it was heavily redacted – the names
of all witnesses interviewed by DWIZLIK were redacted.

[10]

CLICK made it quite clear during her questioning that she would not recognize anything
short of an express statement by "JANE SMITH" along the lines of "I consent to the following

his innocence (by proving the sexual encounter with "JANE SMITH" was consensual) rather than requiring his accusers – BUTLER and "JANE SMITH" – to prove that he had in fact violated the school's Policy.

59.     By shifting the burden of proof, BUTLER denied Plaintiff basic rights of due process as guaranteed him under both federal and Indiana state law.

60.     At the conclusion of the hearing, the voting members of the Panel caucused, and submitted a short written report containing their findings and their recommendation.

61.     In a letter dated May 18, 2015, sent by PATTERSON, Plaintiff was informed of the Panel's decision and recommendation: by a "preponderance of the evidence", the panel found him in violation of the school's Civil Rights Equity Grievance Policy,[11] and recommended that he be "dismissed from Butler University immediately."

62.     BUTLER'S policy provided for a severely limited appeal to be filed within three (3) days from the date of the letter.

63.     On May 21, 2015, Plaintiff timely served his appeal, which by school policy was primarily limited to raising procedural errors only.

64.     As his first grounds for appeal, Plaintiff pointed out that the Policy sets forth the rights of the accused, among which are "[t]o be informed of the outcome/resolution of the complaint

_____

specific sexual activity with Plaintiff" as proof of consent.  Such a position is neither consistent with the provisions of BUTLER'S Policy nor with the realities of **consensual** human sexual behavior.

[11]

The vote on the charge of "non-consensual sexual contact" was 2-1 against Plaintiff, and the vote on the charge of "non-consensual sexual intercourse" was 3-0 against him.

16

**and the rationale for the outcome, in writing**." (*Emphasis added*).  However, the Panel's decision, as conveyed to him by PATTERSON, only stated the Panel's decision and recommended punishment; nothing else was provided in writing, thereby severely restricting Plaintiff's ability to determine if one or more members of the Panel demonstrated bias in that report, which would constitute "a procedural error...that significantly impacted the outcome of the hearing", one of the bases set forth in the Policy as grounds for appeal.

65.     This violation of the Policy was "remedied" by PATTERSON by providing the written report of the Panel (referred to above) to Plaintiff **after** his appeal had already been submitted.

66.     As his second procedural grounds for his appeal, Plaintiff pointed out that one of the Panel members (CLICK), through her questioning of Plaintiff at the hearing, demonstrated her misunderstanding of what constitutes proof of consent as that term is defined under BUTLER'S Policy, thereby subjecting Plaintiff to a completely improper burden of proof (as well as shifting the burden of proof on that critical issue to him).

67.     PATTERSON dismissed this grounds for appeal as raising "non-procedural" error.

68.     Plaintiff's third procedural grounds for appeal were related to the second grounds, as he asserted that CLICK'S obvious misunderstanding and/or misapplication of the provisions of BUTLER'S Policy demonstrated a personal bias on her part as well, which clearly would constitute grounds for appeal.

69.     Again, PATTERSON dismissed this grounds for appeal as raising "non-procedural error".

70.     Plaintiff's last grounds for appeal was that newly discovered evidence existed which

17

was relevant to the Panel, *i.e.*, that the parallel investigation by the Marion County Prosecutor's Office resulted in **no** criminal charges being filed against him.

71.    In response, PATTERSON dismissed the evidence as being irrelevant because of the different standards of proof in administrative proceedings and criminal proceedings.  She also noted that Plaintiff "could have called either Detective Sweeney and/or Assistant Prosecutor Rasheed as witnesses, and therefore, there was no "newly discovered evidence."

72.    PATTERSON'S response completely ignored the fact, as stated above, that the prosecutor's decision **not** to charge Plaintiff criminally did not come until **after** the Grievance hearing had already taken place.

73.    Thus, taken as a whole, BUTLER"S response to Plaintiff's appeal shows more desire to uphold the decision to expel him rather than to afford him due process – in short, it appears that BUTLER'S consideration of Plaintiff's appeal was *pro forma*.

**Aftermath**

74.    After being expelled from BUTLER, Plaintiff made applications to several colleges and universities to began a new academic career elsewhere – eight in all.

75.    He was rejected from the first seven schools to which he applied – not because he did not qualify academically, but rather because the schools asked about the circumstances surrounding his dismissal from BUTLER.[12]

76.    Plaintiff answers those inquiries fully and truthfully – although continuing to assert his innocence at all times.

---

[12]

As noted earlier, he was eventually accepted at St. Louis University.

77.     The schools did not care: his applications were summarily rejected once the events at BUTLER were revealed.

78.     Plaintiff became despondent and withdrawn; he also manifested physical signs of depression, including insomnia and loss of appetite.

79.     He also was under the care of a licensed health professional, although that has now stopped, at least temporarily.

80.     Finally, as indicated above, *see supra*, pg. 6, n. 4, shortly before this Complaint was filed, Plaintiff was accepted by St. Louis University in St. Louis, Missouri.  However, as noted above, there is a **<u>significant</u>** difference in the academic quality of the schools:  according to the 2015 <u>U.S. News and World Report</u>'s rankings of America's best colleges, Butler ranked #2 among "Midwest Universities", whereas St. Louis University was only tied for #199 among "National Universities".

81.     Plaintiff has had to retain the services of ANDREW M. KASSIER, P.A. in order to file and prosecute this complaint, and he is obligated to pay them a reasonable fee for their services.

### COUNT I.
### <u>BREACH OF CONTRACT</u>
### (Against BUTLER)

82.     Plaintiff realleges and re-avers the jurisdictional and common allegations contained in paragraphs 1 through 81 above as though specifically pled in this count.

83.     Plaintiff had a contractual relationship with BUTLER, pursuant to which he was promised an undergraduate education, culminating in the award of a degree, provided he met all academic standards of BUTLER and remained a student in good standing.

84.     Pursuant to that contractual relationship, both Plaintiff and BUTLER agreed to abide

by the terms of the Policy (Exhibit "A"), which imposed certain obligations on each of them, including but not limited to a well-defined protocol for BUTLER to follow in the event that one of its students was accused of sexual misconduct involving another BUTLER student.

85.     That Policy, at least in theory, was designed to afford an accused student due process in the investigation and prosecution of allegations of sexual misconduct.

86.     However, as set out with greater specificity above, BUTLER failed to comply with its Policy, and in so doing, breached its obligations under its contract with Plaintiff, by failing to conduct a fair and unbiased investigation and prosecution of the allegations made by "JANE SMITH" against Plaintiff because of his gender and race.

87.     Plaintiff fulfilled his obligations under the parties' contract, or was excused from compliance with same by BUTLER'S breach of its obligations thereunder.

88.     As the direct result of BUTLER'S breach of contract, Plaintiff has suffered injury and incurred compensable damages, and will continue to suffer such injury and damages in the future.

## COUNT II.
## BREACH OF COVENANT OF GOOD FAITH
## AND FAIR DEALING
### (Against BUTLER)

89.     Plaintiff realleges and re-avers the jurisdictional and common allegations contained in paragraphs 1 through 81 above as though specifically pled in this count.

90.     Pursuant to Indiana law, the contract between Plaintiff and BUTLER contained an implied covenant of good faith and fair dealing.

91.     BUTLER breached its duty and obligation of good faith and fair dealing in its

investigation and prosecution of "JANE SMITH'S" allegations against Plaintiff, in its decision-making process, its ultimate imposition of sanctions against Plaintiff, and its refusal to consider newly-discovered evidence which would have served to exonerate Plaintiff.

92.     As the direct and proximate result of BUTLER'S breach of the covenant of good faith and fair dealing, Plaintiff has suffered damages and will continue to suffer such damages in the future.

## COUNT III.
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against All Individual Defendants)

93.     Plaintiff realleges and re-avers the jurisdictional and common allegations contained in paragraphs 1 through 81 above as though specifically pled in this count.

94.     All of the individual Defendants were aware of the contractual relationship between Plaintiff and BUTLER as set forth with greater specificity above, including but not limited to the procedures and protocols set forth in "the Policy."

95.     The individual Defendants intentionally and maliciously interfered with Plaintiff's contractual relationship with BUTLER as set forth above, including but not limited to their failure to insure that BUTLER'S disciplinary process was fair, unbiased, and non-discriminatory to Plaintiff, and/or by denying Plaintiff a fair disciplinary hearing by their actions and/or testimony during those proceedings.

96.     As the direct and proximate result of the actions of the individual Defendants, Plaintiff suffered injury, to-wit: BUTLER'S termination of its contractual relationship with him, and Plaintiff will continue to suffer such injury in the future.

**COUNT IV.**
**(VIOLATION OF 20 U.S.C. §1681) (TITLE IX)**
**(Against All Defendants)**

97.     Plaintiff realleges and re-avers the jurisdictional and common allegations contained in paragraphs 1 through 81 above as though specifically pled in this count.

98.     Plaintiff has a right, pursuant to title IX of the federal Education Amendments of 1972, to not be subjected to discipline by a university (in this case, BUTLER), where sex is a motivating factor in the decision to enforce the school's Policy and to impose sanctions.

99.     Title IX further requires that federally-funded colleges and university, which BUTLER is, must adopt and follow grievance procedures that provide for "prompt and equitable" resolution of Title IX complaints, as set forth with specificity at 34 C.F.R. §106.8(b).

100.     The United States Department of Education, at least as far back as April, 2011, that such "prompt and equitable" procedures must provide, at a minimum, certain specific protections, including "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence." The Department of Education also advised that throughout the pendency of such an investigation, up to and including the hearing, "the parties must have an equal opportunity to present relevant witnesses and other evidence."

101.     As described with greater specificity above, BUTLER violated Plaintiff's Title IX rights when it failed to provide "equitable" procedures to Plaintiff and selectively enforced provisions of "the Policy" against him, in violation of federal law, *i.e.*, Title IX, in spite of evidence that (1) the allegations against him were not credible and (2) unrebutted evidence that the sexual activity between Plaintiff and "JANE SMITH" was, in fact, consensual.

102.     BUTLER further violated Plaintiff's Title IX rights as it appears no investigation

whatsoever was done by BUTLER into whether "JANE SMITH", Plaintiff's accuser, and/or her friends, had themselves violated "the Policy" by, *inter alia*, making false and malicious allegations against Plaintiff regarding his sexual activity with "JANE SMITH".

103. Even after Plaintiff presented (and attempted to present, in his appeal) exculpatory evidence, BUTLER refused to re-open the investigation, or even to re-consider the sanctions imposed against Plaintiff.

104. BUTLER failed to remediate, in any way, its discriminatory actions against Plaintiff.

105. As the direct and proximate result of the actions of BUTLER, Plaintiff has suffered damages, and will continue to suffer such damages in the future.

**COUNT V.**
**VIOLATION OF 42 U.S.C. §1981**
**(Against All Defendants)**

106. Plaintiff realleges and re-avers the jurisdictional and common allegations contained in paragraphs 1 through 81 above as though specifically pled in this count.

107. Pursuant to the federal Civil Rights Act, 42 U.S.C. §1981, Plaintiff has a right to enjoy all of the benefits, privileges, and protections of his contractual relationship with BUTLER without fear of discrimination being exerted or utilized by BUTLER based on his race and/or ethnic origin.

108. As noted above, Plaintiff is Hispanic, whereas "JANE SMITH" (his primary accuser), the other BUTLER students who testified favorably to her, the investigator assigned by BUTLER to the subject complaint, the entire panel who presided over the disciplinary proceedings against Plaintiff, and the other BUTLER personnel named as individual Defendants herein are all non-Hispanic.

23

109.    BUTLER, with the assistance and participation of the individual Defendants, discriminated against Plaintiff, a Hispanic male from Miami, Florida, on the basis of race and/or ethnic origin through its discriminatory enforcement of, and/or performance under, "the Policy", specifically, by the manner in which it handled "JANE SMITH'S" complaint, through and including the disciplinary hearing, and its treatment of Plaintiff after the hearing.

110.    BUTLER also discriminated against Plaintiff through its failure to properly investigate whether "JANE SMITH" had violated "the Policy" through her false and malicious accusations against Plaintiff.

111.    As with its violation of Title IX, as set forth with specificity in the preceding count, BUTLER has failed to remediate its discriminatory actions against Plaintiff as alleged in this count.

112.    As the direct and proximate result of the actions of BUTLER, Plaintiff has suffered damages, and will continue to suffer such damages in the future.

**COUNT VI.**
**DEFAMATION**
**(Against BUTLER)**

113.    Plaintiff realleges and re-avers the jurisdictional and common allegations contained in paragraphs 1 through 81 above as though specifically pled in this count.

114.    Following the conclusion of the disciplinary proceedings described herein, upon information and belief, BUTLER published and made available to third parties the findings and recommendations of the disciplinary panel finding that Plaintiff had violated "the Policy" by engaging in non-consensual sexual activity with "JANE SMITH".

115.    The statements made in said publication were knowingly false and defamatory, and held Plaintiff up to ridicule and scorn in the BUTLER community.

24

116.    Additionally, BUTLER marked Plaintiff's permanent record with the statement "Dismissed permanently from the University", and those records have been disseminated to other colleges and universities by BUTLER.

117.    BUTLER'S reliance on its flawed and discriminatory investigatory and disciplinary process as a basis for publishing the defamatory statements was done with knowing or reckless disregard of the truth.

118.    As the direct and proximate result of the actions of BUTLER, Plaintiff has suffered damages, and will continue to suffer such damages in the future.

## COUNT VII.
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
### (Against All Defendants)

119.    Plaintiff realleges and re-avers the jurisdictional and common allegations contained in paragraphs 1 through 81 above as though specifically pled in this count.

120.    The conduct of Defendants, as described with greater specificity above, was extreme, outrageous, and beyond the scope of common decency and was intended to cause Plaintiff severe emotional distress.

121.    The actions of Defendants not only caused Plaintiff to suffer emotional distress, but also resulted in actual physical injury to Plaintiff, as stated with greater specificity above.

122.    As the direct and proximate result of the actions of Defendants, Plaintiff has suffered damages, and will continue to suffer such damages in the future.

## COUNT VIII.
## <u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>
### (Against All Defendants)

123.    Plaintiff realleges and re-avers the jurisdictional and common allegations contained

in paragraphs 1 through 81 above as though specifically pled in this count.

124.    Each and every Defendant owed a duty to Plaintiff to not make false and malicious allegations of sexual misconduct against him and/or to not participate in the disciplinary proceedings for the purpose of furthering the dissemination of those allegations.

125.    The conduct of Defendants, as described with greater specificity above, was extreme, outrageous, and beyond the scope of common decency and was intended to cause Plaintiff severe emotional distress.

126.    The actions of Defendants not only caused Plaintiff to suffer emotional distress, but also resulted in actual physical injury to Plaintiff, as stated with greater specificity above.

127.    As the direct and proximate result of the actions of Defendants, Plaintiff has suffered damages, and will continue to suffer such damages in the future.

## COUNT IX:  PRELIMINARY AND PERMANENT INJUNCTION
### (Against BUTLER)

128.    Plaintiff realleges and re-avers the jurisdictional and common allegations contained in paragraphs 1 through 81 above as though specifically pled in this count.

129.    BUTLER'S action of permanently dismissing Plaintiff from the university has had a continuing effect upon Plaintiff to the present day.

130.    There exists a strong likelihood of irreparable harm if BUTLER'S ongoing conduct is not enjoined, specifically, its maintaining of student records reflecting that Plaintiff was permanently dismissed from the university, and disseminating that information to any and all third parties requesting to view, or be provided with copies of, Plaintiff's permanent student records.

131.    Plaintiff has no adequate remedy at law.

26

132.    Plaintiff has a substantial likelihood of success on the merits as to his claims.

133.    The threatened injury to Plaintiff outweighs any possible harm to BUTLER.

134.    The granting of a temporary injunction will not disserve the public interest under these circumstances.

135.    Should Plaintiff prevail in this action, he would be entitled to have the temporary injunction made permanent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff "JOHN DOE" prays this Court grant him the following relief:

A.    The entry of judgment in his favor as to all counts of his Complaint;

B.    The entry of an award of compensatory damages, including costs and interest as provided by law;

C.    The entry of both a temporary/preliminary and a permanent injunction against Defendant BUTLER UNIVERSITY that (1) requires it to redact its records to delete any reference to Plaintiff being permanently dismissed from the university and (2) prevents it from disseminating any information to third parties that Plaintiff had been, prior to the disposition of this lawsuit, "permanently dismissed" from the university;

D.    The entry of an award of reasonable attorney's fees as provided by law; and

E.    Any and all other such relief at law or in equity this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury for all claims and issues herein so triable.

DATED this 8th day of August, 2016.

Respectfully submitted,

ANDREW M. KASSIER, P.A.
Dickman Building
4500 LeJeune Road
Coral Gables, Florida   33146
(305)-662-1000 tel
(305)-661-0909 fax
kassiera@aol.com e-mail

BY:    *s/Andrew M. Kassier*
ANDREW M. KASSIER, ESQ.
(Florida Bar No. 316547)

Attorneys for Plaintiff

28