UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHRISTIAN AYALA, a/k/a JOHN DOE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BUTLER UNIVERSITY, JAMES M. DANKO, ) <br> LEVESTER JOHNSON, STACIE COLSON ) <br> PATTERSON, ANNE FLAHERTY, SALLY ) <br> CLICK, ERIN MCCLUNEY, ROBERT ) <br> PADGETT, and MARTHA DZIWLIK, ) <br> ) <br> Defendants. ) | Case No. 1:16-cv-01266-TWP-DLP |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants Butler University ("Butler"), James M. Danko, Levester Johnson, Stacie Colson Patterson, Anne Flaherty, Sally Click, Erin McCluney, Robert Padgett, and Martha Dziwlik ("Dziwlik") (collectively, "Defendants") (Filing No. 134). Plaintiff Christian Ayala ("Ayala") filed this lawsuit against the Defendants after he was expelled from Butler for allegedly engaging in non-consensual sexual activity with another Butler student. Ayala asserted claims for breach of contract, defamation, violation of 20 U.S.C. § 1681 ("Title IX"), violation of 42 U.S.C. § 1981, and other state law claims. The Defendants filed their Motion for Summary Judgment, asserting the undisputed facts show that Ayala's claims are not viable. For the following reasons, the Court **grants** the Defendants' Motion for Summary Judgment.

**I.   BACKGROUND**

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Ayala as the non-moving

party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In his Response Brief, Ayala explained, "With the exception of the two issues of material fact stated above, Plaintiff accepts the Statement of Material Facts Not In Dispute as set forth in Defendants' Brief [DE-135] at pgs. 2-14)[1], and incorporates them herein by reference." (Filing No. 157 at 2.) Therefore, the Court admits those material facts as uncontested and without controversy pursuant to Local Rule 56-1(f)(1).

In the fall of 2014, Ayala enrolled as a freshman undergraduate student at Butler in Indianapolis, Indiana (Filing No. 13 at 9). Shortly before midnight on Saturday, April 18, 2015, Ayala decided to attend a fraternity party with some friends (Filing No. 137-4 at 12). At approximately 12:30 a.m. on Sunday, April 19, 2015, fellow Butler student "Jane Smith" ("Jane") arrived at the party. *Id.* at 11. Around 1:30 a.m., Ayala approached Jane and began talking with her. Both had been drinking and they started dancing and kissing at the party. Ayala and Jane decided to leave the party together. Jane's friends tried to stop them from leaving the party together because they were concerned Jane was drunk. However, Jane told her friends that she was just going back to her dorm room. *Id.* at 11–12.

Jane's friend asked her to take a picture of herself when she got back to her dorm room and send the picture to her via text message so that she would know Jane arrived at her dorm room. Once Jane and Ayala arrived at Jane's dorm room, Ayala waited in the hallway, and Jane went inside her room to take a picture. Jane sent the picture of herself to her friend, and she and Ayala then left to go to his dorm room.

---

[1] The two material facts referenced are 1) whether Sally Click properly followed the procedures set forth in Defendants' Civil Rights Equity Grievance Resolution Process and whether her failure to do so indicated gender bias on her behalf against Plaintiff and in favor of Jane, and 2) whether Defendants, in disciplining Plaintiff to the fullest extent possible (i.e., permanent expulsion from the school) treated him differently than other students found to have violated the same proscriptions against non-consensual sexual activity as set forth in the Grievance Process.

2

Jane believed that "just kissing" would happen in Ayala's dorm room. (Filing No. 137-4 at 11–13.) On their way to Ayala's dorm room, at 1:53 a.m., Ayala sent a text message to his roommate, "Don't go back to the room. I don't know this girl's name (insert smiley face with tears)." *Id.* at 13. Ayala later explained that he and his roommate would text each other "don't go back to the room" when they did not want the other to go back to the room because they intended to engage in sexual activity in the room. *Id.*

One of Jane's friends who had followed them out of the party attempted to stop Jane and Ayala before they entered Ayala's dormitory, but Jane told her that she would just be ten minutes. At 2:02 a.m., Jane sent a group text message to her friends, explaining that she promised she would be home soon. At 2:04 a.m., Jane texted her friends that she would be ten minutes. After they went into Ayala's room, Jane and Ayala undressed, and Ayala performed oral sex on Jane. Then Ayala began to have sexual intercourse with Jane. Jane later reported that she told him "stop, it hurts" two times after he began having intercourse with her, but he did not stop (Filing No. 137-4 at 12, 15). While Ayala was having sexual intercourse with her, at 2:10 a.m., Jane texted her friend "I. Basement SOS," "So sorry," "SOS," "Please blow." Jane stated the word "blow" was intended to mean "help" and that her text meant that she was in the basement, she was sorry, and she needed help. At 2:16 a.m., Jane sent a group text to her friends that stated, "I just got raped." *Id.* at 12.

While the sexual activity was occurring between Jane and Ayala, Jane's friends were gathering outside of Ayala's dormitory and trying to get inside. Another student entered the building and let them inside. Other students helped Jane's friends find Ayala's dorm room. While Ayala was having sexual intercourse with Jane, one of Jane's friends knocked on Ayala's bedroom door. Ayala went to the door and opened it. The friend pushed her way into the room and observed Jane naked on the bed and Ayala naked and standing up. The friend helped Jane quickly get

dressed, and they left the bedroom. *Id.* at 12, 13, 15, 17, 18. Jane told her friends that Ayala hurt her, and she told him to stop, but he would not stop. *Id.* at 15, 17, 18.

Jane and her friends reported the incident to the Butler Police Department. Jane met with Detective Diane Sweeney, who drove her to the hospital to be examined. Jane was examined at the hospital and met with Butler victim advocate Sarah Diaz (Filing No. 137-4 at 12, 15, 17, 18). Later that morning, Sarah Diaz sent a report to Defendant Stacie Colston Patterson ("Patterson"), then Butler's Title IX coordinator, that Jane had reported a sexual assault to the Butler Police Department that morning around 3:00 a.m. (Filing No. 137-4 at 6). Jane's parents had been notified of the incident, and they were traveling from Illinois to Indianapolis to be with her. *Id.*

Later that morning (Sunday, April 19, 2015), Jane and her parents met with Patterson and Butler's vice president of student affairs, Defendant Levester Johnson ("Johnson"), to talk about how Butler addressed complaints of sexual assault and to discuss the next steps in the process (Filing No. 137-4 at 9; Filing No. 137-3 at 7–8).

In the afternoon of April 19, 2015, Patterson sent an email to Ayala to inform him that Butler had received a report of an incident involving non-consensual sexual intercourse and non-consensual sexual contact and that the report had named him as the person involved. Patterson requested to meet with Ayala the next day, April 20, 2015, to discuss Ayala's rights and the next steps in the process (Filing No. 137-1 at 31–33). Pursuant to Butler's policy for handling allegations of sexual misconduct, a Title IX advisor was assigned to Ayala to be a resource for him. Scott Peden was assigned as Ayala's Title IX advisor, and he contacted Ayala on April 23, 2015, to let him know that he was available to answer any questions. *Id.* at 36–37.

As Butler's Title IX coordinator, Patterson assigned Defendant Martha Dziwlik ("Dziwlik") to investigate the allegations against Ayala. Dziwlik interviewed Jane on Wednesday,

4

April 22, 2015, and she interviewed Ayala on April 23, 2015 (Filing No. 137-4 at 11).  Ayala's attorney attended the interview with Dziwlik on April 23rd (Filing No. 137-1 at 10; Filing No. 137-2 at 23).  Throughout the next week, Dziwlik interviewed several students who were named by either Jane or Ayala as witnesses or individuals with knowledge of the incident.  Dziwlik held follow-up meetings with Jane on April 27, 2015 and with Ayala on April 30, 2015 to confirm her notes (Filing No. 137-4 at 11).

After she finished her investigation, Dziwlik completed a Title IX investigative report, which summarized her interviews, findings, and recommendations. *Id.* at 11–19.  Based on her interviews and the text messages sent among the witnesses, Dziwlik concluded, "[w]ithin 23 minutes, through documented communication, the situation turned from potentially consensual to potentially non-consensual based on a series of text messages indicating a need for help and that an assault had occurred." *Id.* at 19.  Dziwlik recommended that the case move forward to a formal hearing with a grievance panel because there was "sufficient eviden[ce] to support the claim of non-consensual sexual contact and non-consensual sexual intercourse." *Id.*

On April 30, 2015, Patterson emailed Ayala, informing him that the information obtained from the investigation up to that point in time was sufficient to support a possible university policy violation, and thus, a grievance panel hearing was tentatively scheduled for May 14, 2015 (Filing No. 137-1 at 40).

On May 6, 2015, Defendant Anne Flaherty ("Flaherty"), the dean of student life and grievance panel chair, emailed Ayala to inform him of the date, time, and location of the grievance panel hearing.  The letter also informed Ayala of the identity of the witnesses who would be called and the members of the grievance panel: Defendants Robert Padgett, Erin McCluney, and Sally Click.  The letter invited Ayala to identify any other witnesses who he wished to call at the hearing,

and it informed him that Dziwlik's Title IX investigative report would be provided to him five days before the hearing. *Id.* at 41–43. Ayala received a copy of Dziwlik's investigative report with student names redacted a few days before the hearing. *Id.* at 13.

The formal grievance hearing was held on May 14, 2015. Ayala attended the hearing with his attorney, who served as his advisor. Scott Peden, Ayala's Title IX advisor, also attended the hearing. Jane attended the hearing with her father, who served as her advisor. During the hearing, Dziwlik and five student witnesses testified. Ayala and Jane could ask questions of the witnesses by submitting questions to the panel chair, who would then decide whether the questions would be asked. Jane testified that she never said or did anything to indicate to Ayala, before their physical contact, that she was not consenting to same. Ayala testified that Jane never gave him verbal consent. The members of the grievance panel asked questions of Ayala and Jane, and Ayala and Jane each gave a closing statement. Neither Jane's father nor Ayala's counsel spoke at the hearing. Ayala later acknowledged that he felt he was given a fair opportunity to tell his side of the story at the hearing. *Id.* at 15–18, 53.

After the hearing, the grievance panel deliberated and found by a vote of 2-1 that Ayala was responsible for non-consensual sexual contact and by a vote of 3-0 that Ayala was responsible for non-consensual sexual intercourse. In reaching this determination, the panel did not believe that alcohol prevented either party from being able to consent to sexual activity. (Filing No. 37-4 at 34). The panel considered that Ayala did not ask permission for oral sex or sexual intercourse and did not indicate any specific actions he took to receive consent through word or action. The panel also considered that Jane had told him "stop, it hurts" twice and sent text messages to her friends asking for help. *Id.* Additionally, the witnesses testified that Jane was hysterical when she left Ayala's room, and she specifically stated to them that she "told him to stop, he hurt me." Based

6

on its conclusions, the panel recommended that Ayala be dismissed from Butler immediately, and explained what factors they relied upon to recommend this sanction over a lesser sanction (Filing No. 137-4 at 34–35).

On May 18, 2015, Patterson sent Ayala a letter informing him of the grievance panel's conclusion that he had violated university policy by engaging in non-consensual sexual contact and non-consensual intercourse. The policy defines consent as:

> Consent is knowing, voluntary and clear permission by word or action, to engage in mutually agreed upon sexual activity. Since individuals may experience the same interaction in different ways, it is the responsibility of each party to make certain that the other has consented before engaging in the activity. For consent to be valid there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct.

Filing No. 135 at 3. The recommended sanction was dismissal and Patterson explained that she was upholding the panel's recommendation. She informed Ayala that he was immediately dismissed from Butler, and he had the right to appeal the decision within three days (Filing No. 137-1 at 53–54).

On May 21, 2015, Ayala's attorney submitted a written appeal to Patterson. His counsel's letter explained the bases for the appeal: (1) Patterson failed to inform Ayala in writing of the rationale for the outcome; (2) one of the panel members, Sally Click ("Click"), demanded proof that there had been an express statement of consent through her questioning, which showed she blatantly misunderstood consent; (3) Click's questioning showed a personal bias about consent, which may have influenced the other panel members; and (4) there was new evidence that no criminal charges were going to be pursued against Ayala by the Marion County Prosecutor's Office, which could have changed the panel's decision. *Id.* at 55–59.

On June 4, 2015, Patterson sent Ayala a letter denying his appeal and explaining the reasons for the denial (Filing No. 137-1 at 60–63). Butler's policy did not require the Title IX coordinator

7

to provide a rationale for the panel's decision in the notification to the student; instead, the policy stated that the "Title IX Coordinator will inform the accused individual and the complainant of the final determination within seven (7) business days of the hearing" and that notification will be made in writing (Filing No. 13-1 at 19). Even though university policy did not require it, Patterson included a copy of the panel's deliberation report with her letter denying the appeal so that Ayala could review the panel's rationale (Filing No. 137-1 at 60–63). Patterson explained that not including the rationale in the notice letter did not create a procedural error that significantly impacted the outcome of the hearing. *Id.* at 60.

Concerning Ayala's second and third grounds for appeal, Patterson explained that Click's questions regarding consent were not inappropriate because the grievance panel was hearing a case involving charges of non-consensual sexual contact and non-consensual sexual intercourse. Patterson explained that the policy defined consent as requiring a clear expression of words or actions, and thus, questions regarding the words and actions of both parties about consent were appropriate and not a procedural error. *Id.*

Concerning Ayala's fourth ground for appeal, Patterson explained a review of evidence in a criminal matter is not analogous to a review of information in a university grievance case. Patterson explained that this "new evidence" that criminal charges were not going to be filed against Ayala would not have substantially impacted the panel's findings or recommended sanction. Patterson concluded that the panel's findings and sanction "stand," and the decision to expel Ayala remained. *Id.* at 60–61.

Following his expulsion from Butler, Ayala applied for admission to several universities. When Ayala applied to these other universities, his Butler transcript was provided to them. Ayala's transcript reflected his dismissal from Butler. When Ayala submitted his applications, he provided

an explanation for his expulsion. Ayala also asked Butler officials to send letters to some of the universities that had requested additional information. He was rejected by ten universities because of his disciplinary action at Butler. Ayala was eventually admitted to St. Louis University in January 2016 (Filing No. 137-1 at 25, 27–29; Filing No. 137-4 at 37–46).

On May 23, 2016, Ayala initiated this lawsuit against Jane Smith, Butler, and the Butler employees who participated in his expulsion. He asserted claims for breach of contract, violation of Title IX, violation of 42 U.S.C. § 1981, defamation, negligent infliction of emotional distress, and other state law claims (Filing No. 13). Through a stipulation of dismissal, Ayala's claims against Jane Smith and Jane Smith's counterclaims against Ayala were mutually dismissed (Filing No. 107). Following a partial motion to dismiss filed by the Defendants, the Court dismissed the Title IX claim against the individual Defendants because there is no personal liability under Title IX (Filing No. 122). On May 1, 2018, the Defendants filed the instant Motion for Summary Judgment asserting the remaining claims are not viable (Filing No. 134).

## II. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584

(7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III. DISCUSSION

The Defendants ask the Court to dismiss each of the claims brought against them because there are no factual disputes and the law is in their favor as to each claim. In his Response Brief, Ayala concedes,

> [U]pon a complete review of BUTLER'S motion, supporting brief, and exhibits filed in support of summary judgment, in his duty of candor to the Court, [Ayala] recognizes that several of the pending claims are indeed subject to summary judgment, namely, Count I (Breach of Contract), Count II (Breach of Covenant of Good Faith and Fair Dealing, Count III (Tortious Interference with Contract), Count V (Violation of 42 U.S.C. ¶1981), Count VI (Defamation), Count VII

  Intentional Infliction of Emotional Distress), Count VIII (Negligent Infliction of Emotional Distress), and Count IX (Preliminary and Permanent Injunctions). Accordingly, Plaintiff will not present argument in opposition to summary judgment on these counts.

(Filing No. 157 at 1–2.) With no factual disputes and with the law in favor of the Defendants on these claims, and in light of Ayala's concession and lack of opposition, the Court **grants** summary judgment to the Defendants on each of these claims.[2]

  Ayala challenges summary judgment on the Title IX claim against Butler, arguing that there are two genuine issues of material fact in dispute. Ayala first argues that Click demonstrated a bias against him and in favor of Jane and the female witnesses through her questions about verbal consent, and through her questioning, Click implied that he was a "'predatory' male student who posed a threat to Defendants' female students." (Filing No. 157 at 3.) Ayala asserts,

> Click's questioning, although not composed of improper questions, was persistent in its hyperfocus on consent through words, despite undisputed (and overwhelming) testimony from both [Ayala] and [Jane], as well as other students who saw the two of them together for an extended period of time the night of the incident, indicating that the acts of sexual conduct were consensual.

*Id.* at 7.

  Second, Ayala contends that "the entire investigation focused on [Jane] as 'victim' and [Ayala] as an 'assailant', with no indication of any consideration that the actions of [Jane] herself might also have violated the school's policy on the issue of obtaining consent before engaging in sexual conduct." *Id*. He argues that Click's pointed and persistent questions about obtaining verbal consent shows a gender bias on the part of Butler and the members of the grievance panel.

---

[2] The Court pauses to recognize the professionalism and candor of Ayala's counsel. While some attorneys may be prone to "dig in their heels" and oppose an inevitable adverse result, counsel in this case respectably acknowledged the lack of viability of some of his claims. The Court appreciates counsel's candor and the preservation of judicial resources as well as the preservation of both parties' resources.

In support of his bias argument, Ayala offers that Butler addressed a similar grievance complaint during the 2014–15 academic school year. In that case, the complainant was female and respondent, a male, were Butler students, and the respondent was accused and found guilty of non-consensual sexual activity. However, Butler did not expel the male student; rather, Butler withheld his diploma for one year because both students were about to graduate when the incident occurred (Filing No. 137-2 at 12–13). Ayala asserts that the different outcome in the earlier case shows a bias against him.

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). To support a viable Title IX claim, a plaintiff must show that the educational institution discriminated against the plaintiff because of gender. *Ludlow v. Northwestern Univ.*, 79 F. Supp. 3d 824, 835 (N.D. Ill. 2015).

One category of Title IX claims attacking a university's disciplinary proceeding is the "erroneous outcome" claim, where "the plaintiff was innocent and wrongly found to have committed an offense." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). "A plaintiff alleging an 'erroneous outcome' claim under Title IX must first 'allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the proceedings' and then also 'allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.'" *Doe v. Purdue Univ.*, 281 F. Supp. 3d 754, 774 (N.D. Ind. 2017) (quoting *Yusuf*, 35 F.3d at 715).

The Defendants argue that there is no evidence that would cast doubt on the accuracy of Butler's grievance proceedings or that would establish gender bias was a motivating factor behind any alleged erroneous finding. They assert that the designated evidence shows Butler followed all

of its grievance policies throughout the investigation, at the hearing, and after the hearing. Both Jane and Ayala were interviewed twice. Both were permitted to identify witnesses. Both were present at the hearing, and both were questioned and allowed to submit questions. Both were permitted to give closing statements. After the hearing, Ayala was timely notified of the decision and his right to appeal, which he exercised. The appeal was fully considered and denied. The Defendants assert there are no allegations or evidence that Butler failed to follow its policies, but rather, Ayala simply dislikes and disagrees with the panel's findings and conclusions.

The Defendants also argue there is no evidence that any gender bias influenced the panel's decision. Click's questions about verbal consent in a case about non-consensual sexual conduct do not implicate gender. If anything, the Defendants assert, Click's questions tenuously might show bias in favor of alleged victims of sexual assault, but even that does not establish gender discrimination. *See Doe v. Miami Univ.*, 247 F. Supp. 3d 875, 888 (S.D. Ohio 2017) ("However, as this Court has observed, 'demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students.'"); *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 955 (N.D. Ill. 2017) (plaintiff's allegations that a grievance panel questioned him more "aggressively" than the alleged victim "at best" showed "a bias in favor of sexual assault complainants and against those accused of sexual assault, regardless of gender").

The Defendants assert that Ayala's contention that Click's questions showed gender bias is pure speculation and speculation cannot defeat summary judgment. *See Houlihan v. City of Chicago*, 871 F.3d 540, 554 (7th Cir. 2017) ("[S]peculation cannot defeat summary judgment."); *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors, and

'[d]iscrimination law would be unmanageable if disgruntled employees . . . could defeat summary judgment by affidavits speculating about the defendant's motives.'")

Upon review of the designated evidence and the parties' arguments concerning the Title IX claim, the Court concludes that there is no evidence to show that gender bias was a motivating factor behind the proceedings, the findings, or the sanction, let alone behind any erroneous findings. Ayala's comparison between his case and the male student's case in 2014 where the student's diploma was withheld rather than expulsion, is not helpful to his claim. The fact that Butler may have treated another male student more favorably than Ayala does not show bias as the students are the same gender. Moreover, the circumstances are different in that the other male student had already completed his degree at the time of the alleged sexual assault.

Concerning Click's questions during the grievance hearing, Ayala acknowledged in his deposition that Click's questions were reasonable in this case of non-consensual sexual activity, and he acknowledged in his Response Brief that the questions were not improper (Filing No. 137-1 at 19; Filing No. 157 at 7). Click's two questions about whether Ayala obtained verbal consent from Jane to engage in sexual activity did not directly show any gender bias nor did they imply any gender bias. Finally, the panel's deliberation report reflects that the panel understood that consent could be obtained either verbally or by action, as evidenced by the finding that Ayala "did not indicate any specific actions that he took to get consent either by *word or action."* (Filing No. 137-4 at 34.) Because the evidence does not show any gender bias by Butler; Ayala's Title IX claim necessarily fails. Therefore, summary judgment is appropriate on this claim.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Defendants' Motion for Summary Judgment (Filing No. 134). Each of the claims asserted by Ayala against the Defendants is

14

**dismissed**.  With all claims, counterclaims, and crossclaims having been resolved in this litigation, this case is terminated.

The Court will issue final judgment under separate order.

**SO ORDERED.**

Date: 10/19/2018

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Joseph Damien Ackerman
HINSHAW & CULBERTSON
jackerman@hinshawlaw.com

John K. Bennett
JACKSON LEWIS PC
bennettj@jacksonlewis.com

Scott B. Cockrum
HINSHAW & CULBERTSON
scockrum@hinshawlaw.com

Mark C. Engling
FREUND FREEZE & ARNOLD
mengling@ffalaw.com

Stephen V. Freeze
FREUND FREEZE & ARNOLD
sfreeze@ffalaw.com

Andrew M. Kassier
ANDREW M. KASSIER, P.A.
kassiera@aol.com

Melissa K. Taft
JACKSON LEWIS PC
melissa.taft@jacksonlewis.com

Craig W. Wiley
JACKSON LEWIS PC
craig.wiley@jacksonlewis.com